IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA

| | |
|---|---|
| TONY A. COX, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 1:11-cv-317 |
| v. ) | |
| ) | *Mattice / Lee* |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Tony A. Cox brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits. Plaintiff filed a motion for judgment on the pleadings and Defendant moved for summary judgment [Docs. 10, 12]. Plaintiff seeks remand to the Commissioner and argues the Administrative Law Judge ("ALJ") should have found that he was disabled because he met the listing for mental retardation.

For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings [Doc. 10] be **GRANTED IN PART** to the extent it seeks remand to the Commissioner and **DENIED IN PART** to the extent it seeks an award of benefits; (2) the Commissioner's motion for summary judgment [Doc. 12] be **DENIED**; and (3) the Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g).

## I. ADMINISTRATIVE PROCEEDINGS

On October 5, 2009, Plaintiff filed for DIB and SSI benefits, alleging disability as of January 30, 2004 (Transcript ("Tr.") 108-19). His claim was denied initially and upon reconsideration and he requested a hearing before an ALJ (Tr. 44-60, 66-67). The ALJ held a hearing on March 24, 2011, during which Plaintiff was represented by an attorney (Tr. 27-43). The ALJ issued his decision on March 30, 2011 and found that Plaintiff was not disabled because there were jobs in significant numbers in the national economy that Plaintiff could perform (Tr. 9-22). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (Tr. 1-3). Plaintiff filed the instant action on November 3, 2011 [Doc. 1].

## II. FACTUAL BACKGROUND

### A. Education and Background

Plaintiff was 36 at the time of the hearing before the ALJ and had ceased schooling in the ninth grade (Tr. 31-32). Plaintiff testified he could not read and could only write his name, but he could recognize road signs by shape; he had not driven for several years, however, after losing his license for a DUI (Tr. 32, 37-38). Plaintiff had prior work experience as a frame builder from 1991 to 2008 (Tr. 32, 40). Plaintiff testified he had not worked since 2008, when he was laid off from his job due to the economy (Tr. 30).

Plaintiff was diabetic and treated the condition with pills; he had high blood pressure treated by medication; had three bulging discs in his back; and had previously had rotator cuff surgery on his right shoulder (Tr. 33-34). Plaintiff testified he could not lift his arm above his shoulder and his shoulder still hurt at a level of seven or eight on a scale of one to 10 (Tr. 34). Plaintiff also had a sleep disorder and took medication and used a continuous positive airway

pressure ("CPAP") machine (Tr. 35). His medications made him sleepy and he could not concentrate on any tasks after taking them; if he was sitting still after taking medicine, he would fall asleep (Tr. 38). Plaintiff's medications also affected his balance and he would stagger when he stood up (Tr. 38-39). Plaintiff testified that due to back pain, he could only sit for about 20 minutes before he needed to move around, and could only stand for 20 to 30 minutes before resting (Tr. 39). Plaintiff could not walk up stairs or lift heavy objects because of his back, but he was able to lift his daughter for a short time even though it hurt (Tr. 39-40).

Plaintiff was treated for mental health problems by Hiwassee Mental Health and testified his problems started when he found his wife dead one morning (Tr. 35). Plaintiff could not sleep at night and often woke up to see if his current wife was still breathing (Tr. 35-36). Plaintiff testified to problems being in public because he could not be around crowds and would start sweating; he had previously experienced problems being around his coworkers (Tr. 37). Plaintiff was married and lived with his wife and young daughter (Tr. 31). On a typical day, Plaintiff would get up and feed his dogs and watch TV (Tr. 37).

### B. Vocational Expert Testimony

During the hearing, the ALJ sought the testimony of vocational expert ("VE") Jane Colvin-Roberson. The ALJ asked the VE to assume an individual of Plaintiff's age, education and past relevant work experience who could perform light work, but could not reach overhead with the right arm, needed occasional postural changes, could not climb ladders, ropes or scaffolds, and, due to borderline intellectual functioning, was limited to simple, unskilled work with no reading or writing, rare contact with the public, occasional contact with supervisors and coworkers, and could adapt to limited change and set limited goals (Tr. 40-41). The VE testified that such an individual could work as a hand packer, with 7,000 jobs regionally and 370,000
3

nationally; a light cleaner, with 2,200 jobs regionally and 130,000 nationally; and an inspector, with 3,100 jobs regionally and 125,000 nationally (Tr. 41). The VE testified that reading and writing would not be required for these jobs, although it could be a problem with the cleaning position if the individual could not read the cleaning labels; the VE testified that assembler could be another option, with 1,600 jobs regionally and 40,000 nationally (Tr. 42). In response to a question by Plaintiff's counsel, the VE testified that an individual who could not sit or stand for more than 20 minutes at a time without taking a break or rest period could not perform the identified jobs (Tr. 42). The VE further testified that an individual who could not concentrate for one to two hour periods before medication started to wear off could not perform the identified jobs (Tr. 42-43).

### C. Medical Records[1]

Plaintiff's school records indicate he was below his grade level in first grade and was conditionally promoted to second grade (Tr. 224). Plaintiff scored better than 40% of students nationally on a readiness test given in kindergarten or first grade (Tr. 230). An achievement test taken when Plaintiff was in second grade indicated Plaintiff tested at grade level 1.3 to a high of 2.3 in science (Tr. 229). Plaintiff was noted to be below grade level in second grade as well, but he advanced to third grade (Tr. 224). Plaintiff was not promoted to fourth grade and instead repeated third grade; in his second year in third grade, Plaintiff was again noted to be below grade level (Tr. 224). Scores from a California Achievement Test given to Plaintiff several times from 1980 to 1984 show Plaintiff generally scored below his grade level (Tr. 231). Plaintiff was in speech therapy in 1984-1985 due to problems with articulation (Tr. 227). Although Plaintiff

---

[1] Because Plaintiff only makes an argument that he meets the listing for mental retardation and does not argue the ALJ erred in his determination as to Plaintiff's physical impairments, the medical records summarized will focus exclusively on his school records and mental impairments.

4

was graded satisfactory in health classes, music, and art, Plaintiff's grades from the fourth grade through the eighth grade were generally Ds and Fs, with an occasional C and one B in physical education (Tr. 224). Plaintiff was in special education resource classes for reading from 1985 to 1989 (Tr. 226). It appears Plaintiff repeated ninth grade before leaving school, as there are grades and separate classes indicated for the ninth grade in years 1989-1990 and 1990-1991; Plaintiff only received one credit for the school year 1989-1990 (Tr. 224, 228). A basic skills achievement test administered in 1987 indicated Plaintiff mastered 10% of the reading objectives and 33% of the math objectives; the same test administered in 1989 indicated 0% of reading objectives and 26% of math objectives (Tr. 232). The test was administered twice in 1990, and Plaintiff received a score of 38% in language and 76% in math the first time, and 62% in language the second time[2] (Tr. 232).

Plaintiff complained of anxiety to his primary care physician as early as 2006 (Tr. 293-305, 307). In August 2009, Plaintiff first sought mental health treatment at Volunteer Behavioral Health. During this initial assessment, Plaintiff reported problems sleeping after the death of his wife, anxiety being around people, and hearing voices; he had never had mental health treatment before and stated he could not work because he could not stand to be around people (Tr. 288-92, 429-31). Plaintiff was diagnosed with an anxiety disorder, not otherwise specified and he was assigned a Global Assessment of Functioning ("GAF") score of 50[3] (Tr. 291).

During a subsequent treatment session on September 15, 2009, Plaintiff reported that he would start sweating in crowds and heard voices; he was depressed, paranoid, and had anger

---

[2] No math score is indicated on the test administered in November 1990.

[3] A GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

5

issues (Tr. 259). Plaintiff also reported problems sleeping because his sleep apnea mask felt like it was smothering him (Tr. 259). Plaintiff was diagnosed with a psychotic disorder, not otherwise specified; bereavement; a learning disorder, not otherwise specified; and an anxiety disorder, not otherwise specified (Tr. 259-60). The diagnoses were of moderate severity and his GAF score was 50 (Tr. 260). On October 15, 2009, Plaintiff refused to take the medication prescribed by Volunteer Behavioral Health and reported Ativan prescribed by his primary care physician was not helping; Plaintiff wanted to be prescribed Xanax (Tr. 261). On November 3, 2009, Plaintiff stated he was taking his medication and his mood, depression, and irritability had improved (Tr. 263). Plaintiff's GAF score was 55 (Tr. 264). During a visit on December 3, 2009, Plaintiff reported having severe anxiety attacks and needed two Valium at a time to prevent the attacks; he was still hearing voices and his GAF score was 55 (Tr. 265-66).

Plaintiff underwent a psychological consultative evaluation with Benjamin Biller, M.S. on December 14, 2009 (Tr. 350-55). During the evaluation, Plaintiff stated he had problems in school and was enrolled in special education classes and that he could not read or write; he also reported that his physical problems had contributed to anxiety and depression (Tr. 351). Plaintiff reported having social problems, difficulty being with people because he could not keep up with them intellectually, and a dislike of being in crowded places (Tr. 351). Mr. Biller opined that Plaintiff was not trying to appear less competent than he actually was and was functioning in the very low range of intelligence based on his conversation, ability to respond to questions and past experiences (Tr. 352). Mr. Biller noted Plaintiff was socially withdrawn during the examination and he reported being unable to do his own grocery shopping or look up a name in a phone book (Tr. 352-53). Mr. Biller administered the Weschler Adult Intelligence Scale-III test, on which Plaintiff obtained a verbal IQ of 65, a performance IQ of 68, and a full scale IQ of 63 (Tr. 353).

6

On the Wide Range Achievement Test ("WRAT"), Plaintiff was reading at a second grade level, spelling at a third grade level, and his math skills were at a fourth grade level; all scores were in the first percentile or below (Tr. 254). Based on the subtest scores and Plaintiff's scores on the Wide Range Achievement Test, Mr. Biller opined the scores indicated an individual who was likely mentally retarded (Tr. 352-53). Mr. Biller diagnosed Plaintiff with a dysthymic disorder, polysubstance dependence in reported remission, social phobia, and mild mental retardation and assigned Plaintiff a GAF score of 45 (Tr. 354).

On December 31, 2009, Plaintiff returned to Volunteer Behavioral Health and reported satisfaction with a medication change and stated his anxiety was a lot better with medicine (Tr. 267-68). Dr. Norma J. Calway-Fagen reviewed Plaintiff's file on February 10, 2010 and opined that Plaintiff was experiencing borderline intellectual functioning based on his IQ score, as he had no history of mental retardation documented in the record (Tr. 387-99). Dr. Calway-Fagen opined Plaintiff was moderately limited in a number of areas, including the ability to understand and carry out detailed instructions and make simple work-related decisions, and was markedly limited in his ability to interact appropriately with the general public (Tr. 420-23). Dr. P. Davis affirmed Dr. Calway-Fagen's assessment on May 19, 2010 (Tr. 449).

During a visit with Volunteer Behavioral Health on February 26, 2010, Plaintiff reported he had stopped taking one of his medications due to incontinence, he was moderately depressed and irritable, was having anxiety attacks in public or around people, and was still occasionally hearing non-threatening and non-commanding voices (Tr. 269-70). His GAF score was 52 (Tr. 270). On March 30, 2010, Plaintiff reported the voices were cussing him and calling him names; he was depressed sometimes and still experiencing anxiety in public places (Tr. 271-72). During Plaintiff's next visit on May 13, 2010, Plaintiff reported increased anxiety and depression, as he

7

Case 1:11-cv-00317-HSM-SKL   Document 15   Filed 09/07/12   Page 7 of 19   PageID #: 77

was not coping well with stressors (Tr. 273-74). On July 8, 2010, Plaintiff reported still hearing voices at times and his depression was moderate, but his anger was less intense and less frequent; Plaintiff was experiencing stress from not having a job and was frustrated that he had been turned down for disability twice (Tr. 275-76). Plaintiff's GAF score was 55 (Tr. 276). During a September 28, 2010 visit, Plaintiff reported increased mood swings, high depression, was still hearing voices, and was getting irritable easily (Tr. 277). Plaintiff reported noncompliance with his medications on October 27, 2010 due to side effects (Tr. 279-80). On November 18, 2010, Plaintiff reported mood swings, was still occasionally hearing voices, and reported financial problems and conflict with his wife (Tr. 281-82). Plaintiff's depression and stress were improved on December 16, 2010, and his anxiety was mild to moderate (Tr. 283-84). Plaintiff was frustrated by many problems, including financial issues, on March 4, 2011 and he was still hearing voices (Tr. 285-86).

## III. ELIGIBILITY AND THE ALJ'S FINDINGS

### A. Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The process provides:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from

8

doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### B. ALJ's Application of the Sequential Evaluation Process

At step one of the sequential evaluation process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since January, 30 2004 (Tr. 14). The ALJ concluded Plaintiff had not performed any substantial gainful activity since January 30, 2004, the alleged disability onset date, despite that Plaintiff worked some after this date (Tr. 14). At step two, the ALJ found Plaintiff had "severe impairments" including: arthritis of the shoulder, borderline intellectual functioning, obesity, depression and anxiety (Tr. 14). The ALJ determined these impairments "cause[d] more than a slight limitation in the claimant's ability to function" (Tr. 14).

At step three, of chief importance here, the ALJ found Plaintiff did not have any impairment or combination of impairments that would meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 § 12.05 (Tr. 12). More specifically, the ALJ found Plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.02, 12.04, 12.05 or 12.06 (Tr. 13).

The ALJ then determined Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) allowing occasional postural changes and no overhead reaching with the right arm or climbing ladders, ropes or

9

scaffolds; involving simple unskilled light work with no requirements of reading or writing, limited change or goal setting, occasional interaction with supervisors and co-workers and rare interaction with the general public (Tr. 19). At step four, the ALJ found Plaintiff could not perform any of his past relevant work (Tr. 21). At step five, after considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that jobs existed in the national economy that Plaintiff could perform, and he was therefore not disabled (Tr. 21).

## IV. ANALYSIS

Plaintiff challenges the ALJ's finding that he does not meet the requirements of Listing 12.05C.

### A. Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility.

*Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B. Listing 12.05C

Plaintiff argues that a qualifying IQ score is reflective of life-long functioning unless there is some intervening disease or trauma, which is not in the record here. Plaintiff argues his school records do not contradict subaverage general intellectual functioning prior to age 22 [Doc. 11 at PageID#: 43-44]. Plaintiff also argues the ALJ focused on average scores on a "pre-reading" skills test and progress in the context of resource classes in reading, while Plaintiff's records indicate he was consistently receiving poor grades and test scores in all other areas [*id.* at PageID#: 44]. Plaintiff asserts his vocational work history and ability to perform basic activities

11

is not inconsistent with mild mental retardation [*id.* at PageID#: 44-45]. Moreover, Plaintiff contends the ALJ improperly characterized the psychological examiner's report when he noted the examiner believed Plaintiff's depression could have affected his scores, as the examiner did not note any such impression [*id.* at PageID#: 45].

The Commissioner argues that Plaintiff must provide evidence other than his IQ score to establish significant subaverage intellectual functioning manifesting before age 22 to qualify for Listing 12.05C, and Plaintiff's school records show improvement and that he was not in special education classes except for reading [Doc. 13 at PageID#: 55-56]. The Commissioner asserts Plaintiff's low grades could have been affected by absenteeism because his scores were otherwise good when he had better attendance [*id.* at PageID#: 56]. The Commissioner further argues Plaintiff has not shown deficits in adaptive functioning occurring before age 22 and states that Plaintiff's current activities of daily living, work history, and onset of mental problems after the death of his first wife all contradict any assertion that Plaintiff had such deficits prior to age 22 [*id.* at PageID#: 57-58]. Finally, the Commissioner notes Plaintiff's treating physicians diagnosed him with a learning disorder, not mental retardation, and the state agency consultant diagnosed Plaintiff with borderline intellectual functioning [*id.* at PageID#: 58-59].

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The claimant bears the burden of proving every element of the Listing. *King v. Sec'y Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984). Listing 12.05 states:

> Mental retardation refers to significantly subaverage general
> intellectual functioning with deficits in adaptive functioning
> initially manifested during the developmental period; i.e., the

> evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; . . . .

20 C.F.R. Pt. 404, Subpt. P, App'x. 1 § 12.05. As Plaintiff argues, if he met or equaled the criteria of Listing 12.05C, then the sequential evaluation process should have ended at step three with a finding of disability.[4] *See Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). To qualify for Listing 12.05C, a claimant must: (1) have a valid IQ score of 60 to 70, (2) have other "severe" impairments, and (3) meet the "diagnostic description" found in the introductory paragraph of Listing 12.05C (i.e., "significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22"). *Foster*, 279 F.3d at 354-55. Each of these three requirements will be addressed in order.

### 1. Valid IQ Score of 70 or Less

On December 14, 2009, Plaintiff underwent a psychological examination and was administered the Wechsler test. Plaintiff achieved a full scale IQ of 63, a performance IQ of 68, and a verbal IQ of 65 (Tr. 353). Listing 12.05C requires only a valid verbal, performance, or full scale IQ of 60 through 70 and the Commissioner is required to take the lowest of the scores. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00 at D ("In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full-scale IQs are

---

[4] If Listing 12.05C is met, the finding of disability is final even if Plaintiff possesses the RFC to perform some types of work. *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) ("If the impairment meets or equals [the listing], the claimant is conclusively presumed to be disabled."); *Shaw v. Chater*, 221 F.3d 126 (2d Cir. 2000) (claimant establishes an "irrebuttable presumption" of disability when she meets or equals a listing).

provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."); *Tullius v. Astrue*, No. 2:10-cv-00455, 2011 WL 839259, at *5 (S.D. Ohio Mar. 4, 2011). Therefore, the relevant IQ score for purposes of the Listing requirement is Plaintiff's full scale IQ score of 63, and I **FIND** that Plaintiff satisfies this requirement.

### 2. Other Severe Impairments

There is no dispute that Plaintiff suffered from an impairment significantly limiting a work-related function. A claimant must show, along with an IQ score of 60 through 70, a "physical or other mental impairment imposing an additional and significant work-related limitation of function" in order to meet the requirements set out in Listing 12.05. 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.05C. A court will find such a physical or mental impairment "if a claimant is not working and is suffering from a severe impairment." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 438 (6th Cir. 2010). An individual without severe impairments will not be found to be disabled under Listing 12.05C. 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.05C; *Coldiron*, 391 F. App'x at 438. Here, the ALJ found that Plaintiff had severe impairments of arthritis of the shoulder, obesity, and depression and anxiety, which caused more than a slight limitation on his ability to function (Tr. 14). Moreover, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 30, 2004 (Tr. 14). Accordingly, I **FIND** that Plaintiff meets the "severe impairments" requirement of the Listing.

### 3. Diagnostic Description

The diagnostic description of Listing 12.05C contains three separate requirements. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. In addition to meeting the criteria in one of the sections (A, B, C, or D), a claimant must prove: (1) he suffers from "significantly subaverage general intellectual functioning," (2) he suffers from "deficits in adaptive functioning," and (3) these

deficits in adaptive functioning initially manifested before age 22. *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Plaintiff's IQ score is sufficient to establish significant subaverage intellectual functioning. The text of Listing 12.05B-D provides IQ scores with which to measure the level of intellectual functioning. Thus, an IQ score of between 60 and 70, as provided in Listing 12.05B-D, must be adequate to satisfy the "significant" level of subaverage intellectual functioning as required in the introductory paragraph. If a more strict level of IQ was required to satisfy the "significant" standard, Listing 12.05C would exclude claimants the drafters clearly wanted to include.

Plaintiff bears the burden of showing he had "deficits in adaptive functioning" before age 22. *Foster*, 279 F.3d at 354. "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009). The Social Security Administration has yet to quantify how severe the "deficits" must be in order for a claimant to qualify as mentally retarded, *Walls v. Astrue*, 561 F.3d 1048, 1074 (10th Cir. 2009), but this Court has previously indicated the deficits must be more than "potential" or "moderate." *Payne v. Comm'r of Soc. Sec.*, No. 3:07-CV-251, 2008 WL 2894482, at *4 (E.D. Tenn. Jul. 23, 2008). The Supreme Court of the United States, quoting from the Manual of Mental Disorders, described adaptive deficits as "a person's effectiveness in areas such as social skills, communication, daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group." *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993). Activities such as cleaning, shopping, cooking, maintaining a residence, and caring for personal hygiene are considered "adaptive activities" under the applicable regulation. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00C(1). The Sixth Circuit has noted that "[t]he American Psychiatric

Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments ... in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.' " *Hayes*, 357 F. App'x at 677 (quoting DSM–IV–TR at 49).

The ALJ limited his discussion of his findings concerning Listing 12.05C to the following:

> I note the clamant reported he is illiterate and counsel suggests the claimant meets listing level severity of 12.05. However, the record fails to show significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., before age 22. Indeed, school records show that testing in September 1980, showed no low scores. In fact, the claimant scored high in language and average in reading. Although testing in June 1985, showed the claimant's reading was unsatisfactory, further testing from May 1986 through May 1989, showed the claimant's reading continually improved each year. The record shows the claimant is not dependent on others for personal needs and is able to follow simple directions. The psychological consultative examiner diagnosed mild mental retardation; however, the record shows only mild to moderate limitation in adaptive function. In addition, the psychological consultative examiner noted the claimant appeared depressed which could have affected his scores. Indeed, the claimant has worked in the past and there is no evidence of his being fired due to the inability to perform job duties.

(Tr. 17).[5]

As a preliminary matter, the ALJ's suggestion that Plaintiff's depression may have affected his scores does not provide support for his decision. Although Mr. Biller did note that Plaintiff's depression would likely contribute to Plaintiff's limitations in his conclusion, Mr.

---

[5] The Commissioner makes several assertions that arguably might support the ALJ's decision, such as an assertion that Plaintiff's grades were acceptable when he had fewer absences. However, the ALJ did not make any statement about Plaintiff's absences in his decision and such a post-hoc rationalization does not provide a basis upon which to affirm the ALJ's decision.

16

Biller noted Plaintiff's test results were an accurate reflection of his abilities without any mention of depression affecting his effort.

Moreover, there are various test scores in the record from 1980-1984 and again from 1987-1990, but the ALJ's statement that "testing" of Plaintiff's reading showed continual improvement from 1986 to 1989 appears to be based merely on comments made by his reading resource teachers, not any actual tests (Tr. 226).[6] Therefore, it appears the ALJ rejected Mr. Biller's diagnosis of mild mental retardation and limited the discussion of any problems manifesting before age 22 primarily on a "pre-reading" test administered in kindergarten or first grade and brief notes from Plaintiff's reading resource teachers.

The ALJ did not discuss any other relevant evidence in the record to support his findings concerning Listing 12.05C, such as Plaintiff's IQ scores; Plaintiff's consistently low grades in substantive subjects like English, history and math; below grade level scores on achievement tests; low scores on basic skills tests administered from 1987 to 1990; that Plaintiff repeated the third grade and possibly the ninth grade; or Plaintiff's inability to read and write.[7] In addition, although the ALJ stated Plaintiff was not dependent on others for personal needs, Plaintiff indicated on his function reports that his wife needs to remind him to bathe, shave, feed the dogs, and take his medication (Tr. 158-64, 200-01). Plaintiff further reported that he had memory problems and would often lose his train of thought while completing tasks and could not understand or remember very well (Tr. 164, 206). Plaintiff did not testify to these problems

---

[6] These comments state only that Plaintiff's reading progress was unsatisfactory in 1985, he made improvement in 1986, some progress in 1987, good progress in 1988, and some improvement in 1989 (Tr. 226).

[7] In fact, the ALJ seemed to doubt Plaintiff could not read or write, as he noted in his decision only that Plaintiff reported he was illiterate and, during the hearing, questioned Plaintiff about how he was able to drive if he could not read road signs, and further questioned Plaintiff about a statement made to his mental health providers about the side effects of a drug that had been prescribed to him; Plaintiff stated his wife read the side effects to him (Tr. 32, 36).

during the hearing, but he was not specifically asked about his childhood, schooling, or current intellectual problems besides his inability to read and write.

Accordingly, there was evidence in the record from which the ALJ could have found Plaintiff had deficits in adaptive functioning, particularly with communication due to his limited reading and writing abilities; academic skills, as the WRAT showed Plaintiff was functioning academically in the first percentile or below; social skills, due to his other mental impairments; daily living and self-care, as Plaintiff needs to be reminded to undertake daily tasks and personal hygiene, and concentration, persistence and pace. There is also evidence in the record that prior to age 22, Plaintiff exhibited deficits in, at the very least, communication and academic skills, as Plaintiff was below his grade level in almost all testing, in resource classes for reading, attended speech therapy for articulation difficulties, and had to repeat at least one grade. The ALJ's decision does not reflect that the ALJ considered the entirety of the evidence which spoke to such deficits and, as such, does not contemplate whether any deficits were severe enough to meet the diagnostic description of Listing 12.05.

Although the ALJ did undertake a discussion of whether Plaintiff met the requirement of establishing deficits in adaptive functioning which manifested prior to age 22, the ALJ failed to discuss—and apparently failed to consider—significant information from Plaintiff's school records and psychological examination that might have supported a finding that Plaintiff met that requirement. Instead, the ALJ focused his discussion on two items of limited worth from Plaintiff's school records, and those two items, along with the ALJ's brief discussion of Plaintiff's ability to care for himself and his work history, do not provide substantial support for the ALJ's decision as it pertains to Plaintiff's ability to meet the requirements of Listing 12.05C.

I **CONCLUDE** the ALJ's decision is not supported by substantial evidence and that this matter should be remanded for an appropriate consideration of all of relevant evidence regarding whether Plaintiff meets the requirements of Listing 12.05C.

V.    **CONCLUSION**

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND**[8] that:

(1) Plaintiff's motion for judgment on the pleadings [Doc. 10] be **GRANTED IN PART** to the extent that it seeks remand of Plaintiff's claim and **DENIED IN PART** to the extent it seeks an award of benefits from this Court;

(2) Defendant's motion for summary judgment [Doc. 12] be **DENIED**; and

(3) The Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for action consistent with this Report and Recommendation.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[8] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).